578 So.2d 729 (1991)
Lazaro Ruben GONZALEZ, Appellant,
v.
The STATE of Florida, Appellee.
No. 90-582.
District Court of Appeal of Florida, Third District.
April 2, 1991.
On Rehearing May 14, 1991.
*730 William P. Cagney, III, and Scott A. Srebnick, Miami, for appellant.
Robert A. Butterworth, Atty. Gen., and Mark S. Dunn, Asst. Atty. Gen., for appellee.
Before HUBBART and BASKIN and GODERICH, JJ.
HUBBART, Judge.
This is an appeal by the defendant from a final judgment of conviction and sentence for trafficking in cocaine which was entered below based on a nolo contendere plea. The defendant, in entering this plea, reserved for appeal the dispositive question of whether the trial court erred in denying his pretrial motion to suppress (a) the subject cocaine, and (b) certain currency, based on Fourth Amendment grounds; this question, *731 in turn, depends on whether the defendant's wife voluntarily consented to a police search of the defendant's home where the cocaine and currency were seized. For reasons which follow, we conclude that the subject consent was involuntarily obtained and reverse.

I
Two narcotics detectives from the Metro-Dade Police Department were conducting an evening surveillance at an abandoned shopping center in southwest Dade County. They observed a man make several telephone calls from both a pay telephone booth and a car phone located in the car the man was driving. Their suspicions aroused, the police followed the suspect to the nearby residence of the defendant Lazaro Gonzalez. There they observed the defendant drive up in an automobile and converse briefly with the man under surveillance; both men then entered the defendant's house. Shortly thereafter, the detectives saw the suspect leave the defendant's residence carrying a small green suitcase and drive off in his car.
The detectives followed the suspect to a nearby bakery-restaurant where they summoned additional police assistance; they then questioned the suspect and searched his car and suitcase with his consent. No contraband drugs were found in this search, although a firearm was secured and seized. Still suspicious, the officers returned to the defendant's residence where they observed the defendant drive off in an automobile. At that point, the officers decided to obtain consent to search the house from whomever was there.
At approximately 9:00 P.M., three of the officers, clad in narcotics raid jackets, approached the front door of the house, while two other officers similarly dressed entered the yard and stationed themselves on both sides of the house for alleged security purposes.[1] The officers were armed, but no one drew a weapon and none of the weapons were visible.[2] The defendant's wife, Ivette Gonzalez, answered the door and had a brief conversation in Spanish with one of the Spanish-speaking officers at the door. This officer identified himself as a Metro-Dade police narcotics detective, stated that the police were conducting a narcotics investigation, and indicated that he "would like to speak with her"; Mrs. Gonzalez then opened the door and invited the police in the house.[3]
Upon entering the house, several of the officers spread around the house and conducted a brief room-to-room search for alleged security purposes to make certain that no one else was on the premises;[4] only the defendant's two small children were discovered in this search. It was then determined that Mrs. Gonzalez could also speak English; an English-speaking officer then explained to Mrs. Gonzalez that the police had just approached a suspicious man who had come from her house, that the man was lying as to certain events that had occurred,[5] and that "it's possible if *732 she would let us do a search of the residence to make sure that nothing was going on at the residence"; Mrs. Gonzalez responded that, "there would be no problem to let us search the house."[6] Subsequently, Mrs. Gonzalez signed a consent form which purported to formalize her prior verbal consent to search the house;[7] during this time, one of the officers explained to her that the police wanted to "look through the house." (R. 284).
Pursuant to the aforesaid consent to search, the police conducted a thorough search of the defendant's house. In the course thereof, they removed the carpet from the master bedroom walk-in closet and discovered a safe located under the floor. They also removed the drop ceiling which covered the walk-in closet, obtained a ladder, and, with a flashlight, went up into the attic crawl space and removed a box containing twenty-two packages of cocaine. Mrs. Gonzalez subsequently signed a second consent form which purported to consent to the search of the floor safe.[8] Mrs. Gonzalez, however, did not know the combination to the safe. The combination was later obtained from the defendant who was arrested based on the seizure of the cocaine from the attic and brought back to the house; the defendant also signed a written consent form which purported to consent to the search of the floor safe.[9] The police opened the safe and seized $104,591 in currency.
The defendant was subsequently charged by information with trafficking in cocaine, to which he entered a plea of not guilty. The defendant filed a motion to suppress the evidence seized by the police from his house without a search warrant based on Fourth Amendment grounds. The trial court conducted an extensive evidentiary hearing in which the above-stated evidence was adduced. At the end of the hearing, the trial court concluded that Mrs. Gonzalez had voluntarily consented to the search in this case, and, accordingly, denied the motion to suppress. The defendant then changed his plea to nolo contendere and reserved for appeal the question of the denial of his motion to suppress. The trial court accepted the plea, adjudicated the defendant guilty, and sentenced him to fifteen years in the state penitentiary, a fine of $250,000, and a surcharge on the fine of $12,500. This appeal follows.

II
It is, of course, well settled that a search of private property conducted by the police without a duly issued search warrant, as here, is per se "unreasonable" under the Fourth Amendment, subject only to a few specifically established and narrowly drawn exceptions.[10] One of these exceptions *733 is a search conducted pursuant to consent[11]  which includes consent given by a third party who possesses common authority over the premises to be searched.[12] However, when the state seeks to rely upon consent to justify the lawfulness of a search, as here, it has the burden of establishing by "clear and convincing evidence" that the consent to search was freely and voluntarily given.[13] We conclude that the state failed to sustain that burden in the instant case.

A
At the outset, we entertain serious doubt as to whether Mrs. Gonzalez voluntarily allowed the police to enter her house. She was confronted at 9 o'clock at night with five police officers clad in police raid jackets, three of whom were on her front doorstep and two who were trespassing on both sides of her house in the yard for supposed security purposes  a truly frightening display of authority. One of the officers identified himself, said the police were conducting a narcotics investigation, and indicated he "would like to speak with her." (R.348). Under these circumstances, we think a reasonable person might well have interpreted this statement as an order, not a request, to let the police enter her house so they could speak to her; if this be the case, her subsequent "invitation" to enter the house was an acquiescence to authority, not a voluntary consent. See, e.g., Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436, 440 (1948); Talavera v. State, 186 So.2d 811 (Fla. 2d DCA 1966).
We need not resolve this question, however, because immediately upon entering the threshold, the police officers spread around the house as if they were on a drug raid and conducted a brief, but totally nonconsensual, room-to-room search of the premises to see if anyone else was there. At best, Mrs. Gonzalez had voluntarily "invited" the police in her home solely for the purpose of speaking to the police about a narcotics investigation; she had not consented to a search of her home. This socalled "protective sweep" of the premises was therefore an unreasonable warrantless search of her house under the Fourth Amendment. Beyond that, this search cannot be upheld as a reasonable "protective sweep" of the premises incident to effecting an arrest with a warrant under Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), because the police had no warrant for the arrest of anyone, were not on the premises to make an arrest, and had no probable cause to effect an arrest of any kind.
This being so, the aforesaid illegal search of the house tainted and rendered involuntary the subsequent verbal and written consent given by Mrs. Gonzalez to search the premises, including the floor safe. The police had already demonstrated to Mrs. Gonzalez, when they initially "swept" through her house, that they had an absolute right to search the premises and that her "consent" to any further search was a mere formality which she could not refuse. Taylor v. State, 355 So.2d 180, 184 (Fla. 3d DCA), cert. denied, 361 So.2d 835 (Fla. 1978). Moreover, the defendant was subsequently arrested based on the illegal nonconsensual seizure *734 of the cocaine from the attic  and, consequently, his subsequent consent to the search of the safe was tainted and rendered involuntary. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Indeed, the law is well settled that where, as here, a "consent [to search] is obtained after illegal police activity such as an illegal search or arrest, the unlawful police action presumptively taints and renders involuntary any consent to search." Norman v. State, 379 So.2d 643, 646-47 (Fla. 1980). We see nothing in this record which would serve to dissipate the taint of the illegal police search and arrest in this case so as to render voluntary the aforesaid "consent" to search.[14] We therefore conclude that the trial court erred in denying the defendant's motion to suppress.[15]

B
In so ruling, however, we reject the defendant's contention that the police had no constitutional authority under the Fourth Amendment to approach the defendant's house and seek a consent to search such house from the occupants therein, unless there was probable cause or reasonably articulable suspicion for such a search; plainly, the police have the authority to seek a voluntary consent to search constitutionally protected premises without prior proof of criminal wrongdoing, as this is a perfectly proper tool of police investigation. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Nor are we persuaded that Bostick v. State, 554 So.2d 1153 (Fla. 1989), cert. granted, ___ U.S. ___, 111 S.Ct. 241, 112 L.Ed.2d 201 (1990), involving the search of passengers on a bus, supports the defendant's asserted proposition.
Nonetheless, we agree that a private home, as here, is an area where a person enjoys the highest reasonable expectation of privacy under the Fourth Amendment, see, e.g., Payton v. New York, 445 U.S. 573, 585, 589-90, 100 S.Ct. 1371, 1379, 1381-82, 63 L.Ed.2d 639, 650, 653 (1980), and that, accordingly, the factors bearing on the voluntariness of a consent to search a home must be scrutinized with special care. Although the police are certainly free to seek a voluntary consent to search a home, they are not entitled to use the coercive tactics which this record reveals to secure that consent and, indeed, must approach the task with some circumspection. "The knock at the door [as here], whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to *735 be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples." Wolf v. Colorado, 338 U.S. 25, 28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782, 1785-86 (1949). The courts of this state and nation will not tolerate such exhibitions of overreaching police behavior  and any evidence secured thereby will not be admissible in our courts to convict any person who, as here, is a victim of such lawless conduct. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
Of course, the search in this case yielded illicit drugs and some might argue that we should wink at such lawlessness because it uncovered evidence of criminal wrongdoing. But, to start down such a totalitarian path would be to endanger the rights of all our people, including the innocent and the law abiding; only by excluding from evidence the fruits of a Fourth Amendment violation against an otherwise guilty person, as here, can we expect to deter such police behavior in the future and thus protect the rights of everyone. "Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct. Thus its major thrust is a deterrent one, and experience has taught that it is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere `form of words.'" Terry v. Ohio, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, 900-01 (1968) (citations omitted). Stated differently, the courts can protect the innocent and law abiding against unreasonable searches and seizures "only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty" because such exclusion removes the incentive for the police to engage in lawless behavior against anybody, innocent and guilty alike. Brinegar v. United States, 338 U.S. 160, 181, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879, 1893 (1949) (Jackson, J., dissenting). Indeed, "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." United States v. Rabinowitz, 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting), dissent approved in part, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). To look the other way, then, when the police abuse the rights of the guilty, as here, is to endanger the rights of everyone.
The final judgment of conviction under review is reversed and the cause is remanded to the trial court with directions to grant the defendant's motion to suppress and to discharge the defendant from the cause.
Reversed and remanded.

ON REHEARING
The state has filed a motion for rehearing which we grant in part and deny in part.

A
First, it is correctly urged that our discussion concerning the nature of the state's burden of proof on whether a consent to search is freely and voluntarily given is not entirely accurate. We said that "when the state seeks to rely upon consent to justify the lawfulness of a search, as here, it has the burden of establishing by `clear and convincing evidence' that the consent to search was freely and voluntarily given." (at 733). Although this burden of proof is the correct standard for this case, it is not the correct standard for all cases; we therefore vacate the above-quoted portion of the opinion and substitute therefore the following analysis.
When the state seeks to rely upon consent to justify the lawfulness of a warrantless search, as here, it indisputably has the burden of establishing that the consent to search was freely and voluntarily given.[16] Although the matter is not free from *736 doubt, it would appear that the state's burden in this respect is to establish by a "preponderance of the evidence" that the consent was freely and voluntarily given[17] unless, as is true in this case, such consent was obtained after illegal police action, such as an illegal arrest or search; in the latter event, the state has a higher burden of establishing by "clear and convincing evidence" that there has been an unequivocal break in the chain of illegality sufficient to dissipate the taint of the prior illegal police action and thus render the consent freely and voluntarily given.[18] In the instant case, as previously noted, (1) the police conducted an illegal "protective sweep" of the defendant's premises prior to obtaining Mrs. Gonzalez' consent to search the defendant's house and floor safe, and (2) the police illegally arrested the defendant, based on the fruits of the illegal search of the defendant's attic, prior to obtaining Mr. Gonzalez' consent to search the floor safe. This being so, the state had the burden to establish by clear and convincing evidence that the consents to search in this case were freely and voluntarily given; the state failed to sustain this burden for reasons previously discussed in this opinion.

B
Second, the state "concurs with this [c]ourt's ruling as to the seizure of the 22 kilos of cocaine in this cause" [motion for rehearing at 1], which means that the state now concedes that such cocaine was illegally seized by the police and may not be used against the defendant as evidence in this case. This concession would seem to foreclose any further prosecution of the defendant for trafficking in cocaine, as the state would not appear to have a prima facie case against the defendant for this crime without the subject cocaine. The state, nonetheless, continues to press forward with this appeal and urges that the $104,500.00 in currency was lawfully seized from the defendant's floor safe pursuant to the defendant's voluntary consent, although the defendant was illegally under arrest at the time such consent was obtained, because the defendant was given prior Miranda warnings by the police when initially arrested.
Aside from the fact that this appears to be a purely academic argument which the state has not previously urged in either its brief or at oral argument, the point is entirely unpersuasive in any event; accordingly, the motion for rehearing is denied as to this issue. No court has ever held that the giving of Miranda warnings breaks the chain of prior police illegality, such as an illegal arrest, so as to dissipate the taint of such illegality and thus render a subsequent consent to search free and voluntary. To the contrary, it has been held that the giving of prior Miranda warnings by the police does not in itself render admissible a confession given by a defendant while illegally under arrest. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). It is only where the police advise the defendant of his right to refuse consent to a search that Florida courts have held that the taint of a prior illegal seizure of the defendant's person may be dissipated so as to render a subsequent consent to search free and voluntary. See, e.g., State v. Gribeiro, 513 So.2d 1323, 1324 (Fla. 3d DCA 1987); Husted v. State, 370 So.2d 853 (Fla. 3d DCA 1979). There is no showing on this record that the defendant was ever given such advice prior to signing the consent form in this case; indeed, the record reflects only that Miranda warnings were given to the defendant prior to such signing.[19] It therefore *737 follows that the state's academic and belated claim that the currency in the defendant's floor safe was lawfully seized, based on a voluntary consent, must be rejected. We further find no merit in the balance of the state's motion for rehearing.
NOTES
[1] No evidence was introduced below as to why such security measures were necessary.
[2] One of the police officers so testified below. (R. 224). In contradiction, the defendant's wife, who answered the door, testified below that she could see that the officers had revolvers in their waistlines (Supp. transcript, 1/26/90 hearing at 15). The trial court, however, in denying the motion to suppress necessarily accepted the police testimony on this point, and we are bound by this implicit finding. See Harvey v. State, 502 So.2d 1305, 1306 (Fla. 1st DCA 1987); Dooley v. State, 501 So.2d 18, 18-19 (Fla. 5th DCA 1987); State v. Stephens, 441 So.2d 171, 171 (Fla. 3d DCA 1983); State v. Garcia, 431 So.2d 651, 651 (Fla. 3d DCA 1983).
[3] The above-stated officer so testified below (R. 348). Mrs. Gonzalez, on the other hand, gave a different version of this encounter; she testified that this officer said they were police and that "they needed to come in the house and look around." (Supp. transcript, 1/26/90 hearing at 14-15). The trial court, however, in denying the motion to suppress, necessarily accepted the police testimony on this point, and we are bound by this implicit finding. See supra cases cited in note 2.
[4] One of the police officers as well as Mrs. Gonzalez so testified below (R. 186, Supp. transcript, 1/26/90 hearing at 16-17). No evidence was introduced as to why this security measure was necessary.
[5] Apparently, the suspect had initially denied being at Gonzalez' house. (R. 83).
[6] One of the officers so testified below (R. 139-40). Mrs. Gonzalez, on the other hand, gave a completely different account of this encounter; she testified below that the police officers told her they needed to search the house, that they immediately proceeded to do so, and that the police told her that she needed to sign a consent-to-search form. (Supp. transcript, 1/26/90 hearing at 17-18). We are necessarily bound by the police testimony on this point. See supra notes 2 & 3.
[7] This form was entitled "Waiver of Rights: Consent to Search" and states in its body, "I give consent to the officers of the Metro-Dade Police Department." We entertain serious doubts whether this written form gave the police authority to search the defendant's house inasmuch as the form does not state what Mrs. Gonzalez was consenting to. In view of our disposition of this case, however, we need not reach this question as we assume without deciding that the written form merely formalized Mrs. Gonzalez' prior verbal consent to search the house.
[8] This form was the same as the first written consent form; this being so, it is dubious whether it gives the police consent to do anything, much less search the floor safe. See supra note 6. In view of our disposition of the case, however, we need not reach this question as we assume without deciding that the written form did, in fact, authorize the police to search the floor safe.
[9] This consent form was the same as the prior two consent forms and therefore had the same arguable defects previously discussed. See supra notes 7 & 8. As with the other two forms, however, we assume without deciding that this consent form did, in fact, give the police consent to search the floor safe.
[10] United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958); McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153, 158 (1948); Norman v. State, 379 So.2d 643 (Fla. 1980); Hornblower v. State, 351 So.2d 716 (Fla. 1977); Haile v. Gardner, 82 Fla. 355, 359-60, 91 So. 376, 378 (1921); Taylor v. State, 355 So.2d 180, 183 (Fla. 3d DCA), cert. denied, 361 So.2d 835 (Fla. 1978); Britton v. State, 336 So.2d 663 (Fla. 1st DCA 1976), cert. denied, 344 So.2d 326 (Fla. 1977); Shepard v. State, 319 So.2d 127 (Fla. 1st DCA), cert. denied, 328 So.2d 845 (Fla. 1975); Hannigan v. State, 307 So.2d 850 (Fla. 1st DCA), cert. denied, 315 So.2d 195 (Fla. 1975).
[11] Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973).
[12] United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974); Ferguson v. State, 417 So.2d 631, 634 (Fla. 1982).
[13] Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968); Norman v. State, 379 So.2d 643, 646-47 (Fla. 1980); Sagonias v. State, 89 So.2d 252, 254 (Fla. 1956); Taylor v. State, 355 So.2d 180, 183 (Fla. 3d DCA), cert. denied, 361 So.2d 835 (Fla. 1978).
[14] Although not argued by the state, we have not overlooked the printed advices of rights appearing on the written consent forms which Mrs. Gonzalez signed. Mrs. Gonzalez, however, had already been coerced into verbally consenting to a search of her house, without any such advices of rights, before the police read the written consent forms to her for her signature. It is therefore plain that these subsequent, written advices could not possibly save the prior, coerced, verbal consent to search; moreover, the written consent forms were tainted by the coerced, verbal consent and could not, under any circumstances, dissipate the taint of the prior illegal search. Compare Husted v. State, 370 So.2d 853 (Fla. 3d DCA 1979).
[15] In view of our disposition of this case, it is unnecessary for us to address the defendant's claim  which we deem to be a substantial one  that the police vastly exceeded whatever authority they had to "look through" the house when (1) they removed a drop ceiling of the master bedroom closet and went up into the crawl space of the attic where they found the subject cocaine, and (2) tore up the carpet in the master bedroom closet and discovered the floor safe from which they eventually seized the subject currency. See Walter v. United States, 447 U.S. 649, 656-57, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410, 417-18 (1980); State v. Wells, 539 So.2d 464, 466-68 (Fla. 1989), aff'd, ___ U.S. ___, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); State v. Fuksman, 468 So.2d 1067, 1070 (Fla. 3d DCA 1985); State v. Carney, 423 So.2d 511, 512 (Fla. 3d DCA 1982).

As an aside, it should also be noted, in all fairness to the trial judge, that much of the evidence and argument which was adduced below had nothing to do with the central issue involved in this case. Indeed, the trial judge expressed below his frustration with these prolonged and misdirected inquiries, and remarked that this was the longest motion to suppress hearing he had ever presided over. Nonetheless, the central issue involving the voluntariness of the consent given to search the defendant's house was, without dispute, presented below and was squarely decided by the trial judge.
[16] Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968).
[17] Denehy v. State, 400 So.2d 1216, 1217 (Fla. 1980); State v. Fuksman, 468 So.2d 1067, 1068-69 (Fla. 3d DCA 1985).
[18] Norman v. State, 379 So.2d 643, 646-47 (Fla. 1980); State v. Fuksman, 468 So.2d 1067, 1071-73 (Fla. 3d DCA 1985) (Pearson, J. and Schwartz, C.J., concurring); Jordan v. State, 544 So.2d 1073, 1074 (Fla. 2d DCA 1989); State v. Martin, 532 So.2d 95, 96-97 (Fla. 4th DCA 1988); Alvarez v. State, 515 So.2d 286, 288 (Fla. 4th DCA 1987); State v. Blan, 489 So.2d 865 (Fla. 1st DCA 1986).
[19] We have not overlooked the fact that such advice is contained in the written consent form itself, but there is no showing whatever that this written advice was ever read to or by the defendant prior to signing the form. Indeed, the record is remarkably sparse concerning the exact circumstances surrounding the signing of this form.