615 So.2d 786 (1993)
STATE of Florida, Appellant,
v.
James R. BOYD, Appellee.
Nos. 91-03895, 91-03985.
District Court of Appeal of Florida, Second District.
March 10, 1993.
*787 Robert A. Butterworth, Atty. Gen., Tallahassee, Dell H. Edwards and Sue R. Henderson, Asst. Attys. Gen., Tampa, for appellant.
James Marion Moorman, Public Defender, and Tonja R. Vickers, Asst. Public Defender, Bartow, for appellee.
CAMPBELL, Acting Chief Judge.
In these consolidated appeals, appellant, the state of Florida, seeks reversal of a pretrial order suppressing evidence and an order dismissing Count II of the information, which charged appellee, James R. Boyd, with the improper exhibition of a firearm in violation of section 790.10, Florida Statutes (1991). In addition to the charge of improper exhibition of a firearm, appellee was also charged with resisting an officer with violence, possession of a firearm with altered serial number, possession of cannabis with intent to sell or deliver, possession of drug paraphernalia, possession of cocaine and grand theft. We agree with the state and reverse both orders.
On April 1, 1991, at approximately 5:30 p.m., Deputy Sheriff Gunnoe was dispatched to a residential address in Eloise, Florida. The call reported that there was a man in the yard firing a shotgun. The deputy observed appellee Boyd standing in the yard, pointing a shotgun at other homes in the vicinity. Appellee appeared angry, was yelling and the deputy heard appellee say, "I'll shoot." The deputy identified himself and told appellee to put the gun down and to walk toward the deputy. The deputy told appellee several times: "Deputy sheriff, stop, put the gun down." Appellee did not respond, but kept the gun and started walking toward the deputy. The deputy stepped behind a tree and told appellee he would be shot if he did not put the gun down. Appellee then dropped the gun, but continued toward the deputy. Appellee was arrested for improper exhibition of a firearm.
The deputy then handcuffed appellee, put him in the sheriff's patrol car, and picked up the shotgun from the ground. The deputy looked around the front yard and found a machete and two recently-fired twelve-gauge shotgun shell casings. The deputy found a third shell casing on the side of the house. The front door of the house was open. Appellee did not have any identification, but he told the deputy his name was James Boyd. The name on the mailbox was "Beardon."
At that point, the deputy testified, he believed that an armed burglary had possibly occurred, and that there might be a shooting victim inside the house. No one answered or came to the door when the deputy called. The deputy had no information as to whether a shooting had occurred inside the house. He did not know whether appellee had been firing a gun from the yard into the house. The deputy testified that, without going inside the house and looking, he could not be sure that someone inside the house had not been injured. Based on what the deputy knew, observed and had been told in being dispatched to the home where a shooting had been reported, he had reason to believe that an injured person needing assistance could be inside.
The deputy then entered the house to determine if there was an injured person or persons inside. He stated he was not searching for any drugs or contraband. Approximately three feet from the front door, the deputy saw in plain view a surgical clamp with stains on the end of it. The deputy recognized the clamp as the kind commonly used for holding marijuana cigarettes. He also saw an alligator clip (electrical clamp) and a pipe with residue and smoke stains. During a visual inspection of all the rooms, the deputy saw a large number of tools, including battery chargers, fishing equipment, circular saws, drills, two mechanics roll-around tool boxes and three weedeaters, which filled a utility room off the kitchen. The amount of equipment seemed to the deputy to be unusual. *788 One of the weedeaters was still in a box. The deputy spent less than five minutes inside the house during his search for a possible victim.
Appellee was still sitting in the back of the patrol car when the deputy came out of the house. The deputy called his sergeant and explained the situation. The deputy then asked appellee to sign a consent to search the house. Appellee was given the Miranda warning, and the deputy read the consent to search form to him. The deputy believed appellee had been drinking alcohol, but he appeared to be coherent and to understand the deputy. Appellee signed the consent to search form and the written Miranda warning. He was neither threatened nor coerced to sign the form. Before he signed the consent to search form, he requested that he be present when the search was conducted. Appellee was advised that he had a right to refuse consent. Appellee was taken back inside the house and sat at the table in the dining room while the search was conducted. Three additional deputies arrived and assisted in the search. Some of the equipment found in the house was listed as stolen. Drugs, including eighty grams of marijuana and cocaine residue, were also discovered.
The trial judge, in granting appellee's motion to suppress, apparently relied to a large degree on Gonzalez v. State, 578 So.2d 729 (Fla. 3d DCA 1991). Neither of the orders, however, reveals the reasoning of the judge, nor do the transcripts of the hearings reflect such reasoning except for the judge's oral inquiries as to whether this case was so similar to Gonzalez as to be controlled by it. The issue was not resolved at the hearing. Instead, the trial judge took the matter under advisement and received memoranda from counsel prior to entering his rulings.
We find that the trial judge's reliance on Gonzalez was misplaced because the circumstances of this case are clearly distinguishable from those in Gonzalez. The first question is whether appellee voluntarily consented to the search of his house which resulted in the seizure of the contraband. That single principal issue breaks down into two sub-issues.
The first sub-issue is whether Deputy Gunnoe's initial entry into appellee's residence was a legal, nonconsensual, warrantless entry and search. As we will explain, we conclude it was a legal entry and search. The compelling and controlling factors surrounding the legality of warrantless searches of a person's home have been rather frequently pronounced by the courts of this state. In Cross v. State, 469 So.2d 226 (Fla. 2d DCA 1985), affirmed, 487 So.2d 1056, cert. dismissed, 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986), this court clearly pronounced its own understanding and conclusions regarding these factors as follows:
Warrantless searches are per se unreasonable under the Fourth Amendment to the United States Constitution and Article I, section 12, of the Florida Constitution, subject to a few specifically established and well-delineated exceptions. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is the emergency doctrine. This exception had its origin in the dictum in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), where the Supreme Court stated that exceptional circumstances could dispense with the need for a warrant.
This emergency or exigency rule first received recognition in Florida in Webster v. State, 201 So.2d 789 (Fla. 4th DCA 1967), and has been applied under various circumstances. See, e.g., Guin v. City of Riviera Beach, 388 So.2d 604 (Fla. 4th DCA 1980) (reasonable belief that a crime was in progress held sufficient to justify a warrantless entry); Grant v. State, 374 So.2d 630 (Fla. 3d DCA 1979) (officers responding to reported shooting held to have properly entered apartment where they discovered certain evidence); Long v. State, 310 So.2d 35 (Fla. 2d DCA 1975) (preservation of human life justified an emergency entry of a home and admissibility of contraband obtained).
To invoke the emergency rule to search a person's home, the exigencies of *789 the situation must be so compelling as to make a warrantless search objectively reasonable. See Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).
469 So.2d at 227.
The implementation of the emergency or exigency rule exception to the per se unreasonableness of warrantless searches seems to us to require the application of a standard of review that combines the "objective" and "subjective" view of the facts which lead a person to believe that the emergency or exigency exists. The various opinions of our courts on this standard have not been always consistent in the language employed to articulate the standard. Appellee relies on State v. Starkey, 559 So.2d 335, 337 (Fla. 1st DCA 1990), for the rule that "[t]he law is now well settled that the lawfulness of a warrantless search is to be determined by an objective view of the facts, not the subjective view of the person conducting the search. See Padron v. State, 449 So.2d 811, 812 (Fla. 1984), and Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)." It appears that while that statement in Starkey is a correct statement of the law as applied to the facts in that case, the statement also appears to be dicta. Starkey did not deal with a warrantless entry or search into a constitutionally protected area based upon exigent or emergency circumstances without an accompanying intent either to seize or arrest. Starkey dealt instead with the warrantless seizure of evidence from an automobile in a public parking lot which the officer had lawfully observed in plain view from a point outside the automobile and which the officer had probable cause to believe was evidence of a crime.
When the issue is narrowly that of the right of police to enter and investigate a constitutionally protected area in an emergency or because of exigent circumstances without the accompanying intent either to seize or arrest, the standard becomes the reasonableness of the belief of the police as to the existence of emergency or exigent circumstances, and not the existence of the emergency or exigent circumstance in fact. See Webster v. State, 201 So.2d 789 (Fla. 4th DCA 1967). This court, relying on Webster, stated in Long v. State, 310 So.2d 35, 36 (Fla. 2d DCA 1975): "We follow that line of cases holding that it is the belief of the law enforcement officer that exigent or emergency circumstances do exist that is the controlling factor." In Klosieski v. State, 482 So.2d 448, 450 (Fla. 5th DCA), rev. denied, 491 So.2d 281 (Fla. 1986), the court employed the standard of whether "the officers have a reasonable basis to suspect that" an emergency or exigent circumstance exists. But, as this court noted in Cross, 469 So.2d at 227, in reliance on Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978): "To invoke the emergency rule to search a person's home, the exigencies of the situation must be so compelling as to make a warrantless search objectively reasonable." (Emphasis supplied.) Thus we conclude that to allow a warrantless entry into a person's home in an emergency situation, there must be objectively reasonable circumstances that convey to the police officer an articulable, reasonable belief that an emergency exists. An emergency need not, in fact, exist so long as the officer reasonably believes it to exist because of objectively reasonable facts. The officer's conclusion then may be based on a combination of the "objective" nature of the circumstances and the officer's "subjective" perception of those circumstances.
This court in Long relied on Webster for the rule that:
The preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties; it is an overriding justification for what otherwise may be an illegal entry. It follows that a search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person.
310 So.2d at 36. As in Cross, the officer here properly acted within these guidelines. First, he acted upon credible information. He had been dispatched to the scene based upon reports that there was a man in the *790 yard discharging a firearm. Second, he observed a potentially life-threatening, out-of-control situation. When Deputy Gunnoe arrived he found appellee angry, red-faced, holding a shotgun shoulder high aimed in the direction of the residences yelling, "I'll shoot." Deputy Gunnoe had to point his own firearm at appellee, twice order him to put down the shotgun and threaten to shoot appellee before he finally put the shotgun down. Third, he observed evidence that the weapon had been fired and that another individual might be involved. After arresting appellee and placing him in the patrol vehicle, Deputy Gunnoe found three recently-fired shotgun shells in the yard near the front door, which was open. The deputy could not identify who resided in the house, could not get any response from the house and testified he entered through the open front door to see if there were injured persons inside. The name on the mailbox was not appellant's name, thus leading the officer to believe that appellant was shooting, not in his own yard, but in someone else's yard.
As in Cross, the record clearly shows that Deputy Gunnoe had no accompanying intent either to seize contraband or to make an arrest when he entered appellee's home. His sole stated and uncontradicted purpose was the preservation of human life. By contrast, in Gonzalez, upon which the trial judge apparently relied, the police officers returned to the defendant's residence to attempt to persuade the defendant's wife to consent for them to "`do a search of the residence to make sure nothing was going on at the residence'... ." 578 So.2d at 732. The officers in Gonzalez had no warrant of any kind, were not on the premises to make an arrest, and had no probable cause to effect an arrest of any kind. Yet, as soon as the officers entered the Gonzalez home and prior to any consent by Mrs. Gonzalez to search, the police officers spread through the house and conducted a brief, nonconsensual, room-to-room search of the premises.
Because of the objectively reasonable circumstances that caused Deputy Gunnoe to believe that an emergency may exist in regard to the possibility of injured persons in appellee's residence, Deputy Gunnoe's warrantless, nonconsensual entry was legal.
The second sub-issue concerns the voluntariness of appellee's subsequent consent to search. During Deputy Gunnoe's presence in appellee's home on this emergency basis, he observed in plain view various items he believed to be contraband. After consulting with his superiors, he sought to obtain from appellee a consent to again search the premises and seize any such items determined to be contraband. Prior to appellee giving his consent and signing a consent form, Deputy Gunnoe read appellee both the Miranda warning and the consent to search form. Appellee was advised he had the right to refuse consent. Appellee requested and was given the right to be present when the search was conducted. He then signed a written Miranda form as well as a written consent to search form. The testimony of Deputy Gunnoe and the evidence concerning appellee's consent to the subsequent search was uncontradicted. Appellee did not testify.
The rule as stated in Gonzalez, 578 So.2d at 736, is that where the state seeks to rely upon a consent to search, the state has the burden to establish that the consent was freely and voluntarily given by a "preponderance of the evidence" except where the consent was obtained after illegal police action, in which event the state's burden becomes the higher standard of "clear and convincing evidence." Inasmuch as we have determined there was no illegal police action preceding appellee's consent, the state's burden was "preponderance of the evidence." Since the only evidence on the issue was the state's evidence of the voluntary nature of the consent, its burden was met. Moreover, even where a consent is obtained after the taint of illegal police action, the taint may be dissipated by advice to the defendant of his right to refuse to consent so as to render the subsequent consent free and voluntary. See Gonzalez; Husted v. State, 370 So.2d 853 (Fla. 3d DCA 1979).
*791 We finally turn to the order dismissing the count of the information that charged appellee with improper exhibition of a firearm. Section 790.10, Florida Statutes (1991), upon which the charge was based, provides as follows:
If any person having or carrying any dirk, sword, sword cane, firearm, electric weapon or device, or other weapon shall, in the presence of one or more persons, exhibit the same in a rude, careless, angry, or threatening manner, not in necessary self-defense, the person so offending shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.
We again do not know the reasoning of the trial judge in dismissing that count, but it apparently lay in the lack of evidence of third parties who were present when appellee was aiming and pointing his gun and yelling, "I'll shoot." If so, the trial judge misperceived the effect of the statute. It was not necessary that third parties be involved. The statute proscribes any person carrying a firearm in the presence of one or more persons and exhibiting it in a rude, careless, angry or threatening manner. Deputy Gunnoe's testimony was that he observed appellee engaged in just such conduct in Deputy Gunnoe's presence. The presence of Deputy Gunnoe when appellee was displaying his firearm in an angry manner and threatening to shoot was sufficient to sustain the charge. The charge was improperly dismissed.
We reverse both orders entered below and remand for further proceedings consistent herewith.
FRANK and BLUE, JJ., concur.