981 So.2d 585 (2008)
Brian McDONNELL and Christopher McDonnell, Appellants,
v.
STATE of Florida, Appellee.
Nos. 1D06-5731, 1D06-5764.
District Court of Appeal of Florida, First District.
May 12, 2008.
*587 Michael Ufferman, of Michael Ufferman Law Firm, P.A., Tallahassee, for Appellants.
Bill McCollum, Attorney General, and Alan R. Dakan, Assistant Attorney General, Office of the Attorney General, Tallahassee, for Appellee.
PER CURIAM.
Appellants challenge the denial of their motions to suppress evidence recovered from a search of their home and statements they made while in police custody. For the reasons discussed below, we affirm the denial of appellants' motions to suppress the evidence found during the search of their home. We deny, without discussion, appellants' assertions that their statements were involuntary.

I. BACKGROUND
In 2005, appellants Brian and Christopher McDonnell (twin brothers) were charged with a number of criminal offenses, including burglary, grand theft, and aggravated assault. The appellants each filed a motion to suppress certain items found during a search of their residence. They asserted that Christopher's consent to search the home was involuntary.
At the hearing on the motion to suppress, Investigator Mathis testified that on August 12, 2005, he was investigating the theft of an ATM from the Bay Point Marriott. A loss prevention officer at the Marriott had obtained the "tag number" of the truck used during the theft of the ATM, and records indicated that the truck belonged to appellants' father.[1] The appellants' father stated that his son Eric had the truck and had taken it to appellants' residence to take some debris to the Marriott to be thrown away. The police went to the appellants' shared residence at about four in the morning.[2] Christopher McDonnell answered the door in a bath towel. Investigator Mathis told Christopher that he was investigating a theft of an ATM from the Marriott and asked him if he had anything in the house linking him to the theft. Christopher denied any involvement, at which time Investigator Mathis asked appellant for consent to search the home. When Christopher refused, Investigator Mathis left to obtain a warrant while the other officers stayed behind. Christopher stayed on the front porch in his bath towel while Officer Mathis went to secure a warrant. At some point, about an hour and half to two hours later, while waiting for Officer Mathis to return with a warrant, another officer requested and received permission from Christopher to search the home. A warrant for the search was never obtained. Inside the home, officers found a number *588 of incriminating items linking appellants to a number of offenses.
At the conclusion of the hearing, the trial court denied the motions to suppress. The trial court ruled, in essence, that even though a search warrant was never obtained, the police were in the process of getting a warrant, and would have done so because they had sufficient probable cause:
All right, here's what we've got. We have a video tape of the ATM being stolen. The video tape shows the type of truck, it shows the ident , the tag number, and it shows who was doing it. One of the employees says hey, that looks like Christopher McDonnell. Well, you might say he may have been mistaken but guess what, when the truck tag came back to McDonnells' house and they went to the McDonnells' father's house and there is the truck, it's not too much of a need to figure out whether that was a McDonnell or not that was stealing that ATM. The father says Brian had the truck. They go to Brian's house and they talk to Christopher.
Now, when Investigator Mathis left with that information, the picture of the truck, the tag of the truck, the truck, the identification of Christopher, a search warrant was going to be issued on that and he was going to come back to that house and he was going to have that house searched. There was probable cause for a search warrant. He was in the process of getting a search warrant. He came back to the house because there was no need. Instead of waking up the Judge, he came back on a consent and he searched.
The evidence is not suppressed. The testimony about the consent and the Miranda warnings, the statements are not suppressed.
Following the denials of their motions to suppress, the appellants entered no contest pleas to the charges of grand theft, burglary and aggravated assault, reserving the right to appeal the denial of the motions to suppress.

II. NO VOLUNTARY CONSENT TO SEARCH
It is undisputed the police did not have a warrant to search the residence, but relied on the consent of Christopher. In such circumstances, the Florida Supreme Court has held:
The starting point for our fourth amendment analysis is Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), where the United States Supreme Court held that warrantless searches "are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions". . . . Among the established exceptions to the warrant requirement is a search conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In order to rely upon consent to justify the lawfulness of a search, however, the state has the burden of proving that the consent was in fact freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In Florida, the prosecution must show by clear and convincing evidence that the defendant freely and voluntarily consented to the search. Bailey v. State, 319 So.2d 22 (Fla.1975); Sagonias v. State, 89 So.2d 252 (Fla. 1956); Taylor v. State, 355 So.2d 180 (Fla. 3d DCA 1978).
Norman v. State, 379 So.2d 643, 646 (Fla. 1980). The voluntariness of a defendant's consent is determined by considering the totality of the circumstances. Id.; see also *589 Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Wilson v. State, 952 So.2d 564 (Fla. 5th DCA 2007); DeLeon v. State, 700 So.2d 718, 720 (Fla. 2d DCA 1997) ("When, as in this case, a defendant alleges that his consent resulted from coercion or intimidation, the court, in ascertaining the voluntariness of consent, must consider all the circumstances surrounding the encounter and determine whether the police conduct would have communicated to a reasonable person that he was not free to decline the officers' request or otherwise terminate the encounter.").
When consent is at issue, the state does not carry its burden of demonstrating voluntary consent when evidence is introduced of submission to or acquiescence in the apparent legal authority of the police to perform a search. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Reynolds v. State, 592 So.2d 1082, 1086 (Fla.1992); Smith v. State, 904 So.2d 534 (Fla. 1st DCA 2005). The appellants assert that Christopher's consent to search the residence was not voluntary because he acquiesced to a show of authority. Appellants assert the factors showing that the consent to search the residence was involuntary include: (1) the encounter occurred in the early morning hours; (2) there were a number of law enforcement officers present at the residence; (3) Christopher McDonnell remained outside his residence  wearing only a bath towel  for approximately an hour and a half to two hours; (4) Christopher did not believe that he was free to leave the residence during the encounter with law enforcement; (5) during the time that Christopher was waiting by his front door, law enforcement officers announced that they suspected that Christopher had committed a crime and they suspected evidence from the crime would be found within the residence; and (6) the law enforcement officers repeated their request for permission to search the residence, despite knowing that Christopher had previously refused to consent to a search of his residence.
In Kutzorik v. State, 891 So.2d 645 (Fla. 2d DCA 2005), the court identified three circumstances relevant to determining whether consent was voluntary or whether it was given after a defendant had been seized by a show of authority: (1) the time and place of the encounter; (2) the number of officers present; and (3) the officers' words and actions. Id. at 647 (citing Miller v. State, 865 So.2d 584, 587 (Fla. 5th DCA 2004)). In that case, at least three uniformed police officers knocked on a door at 10 p.m. and asked permission to come inside to speak with the occupant. Id. at 646. Once inside the officers asked to look around and were granted permission. Id. The appellant filed a motion to suppress alleging her consent to the search was involuntary. Id.
The Kutzorik court reversed the trial court's order denying the suppression motion, finding that consent was involuntary because the defendant had been seized by a show of authority. The court noted that the encounter took place at the appellant's residence at 10 p.m., which added to the "intimidating circumstance" that the defendant faced. Kutzorik, 891 So.2d at 648. Further, the court noted that at least three uniformed officers were involved in the encounter, which also suggested that the consent was involuntary. Id. The Court explained:
The totality of the circumstances in this case  beginning with the late-night arrival of a uniformed officer at the door, continuing with the entry of three uniformed officers into the small home, followed *590 by an announcement that the police suspected a crime and knew drugs were on the premises, and culminating with repeated requests for consent to search when the resident was in an emotional state  were such that no reasonable person would have felt free to end the encounter by demanding that law enforcement leave her home.
Id. at 648.
Further, in Gonzalez v. State, 578 So.2d 729 (Fla. 3d DCA 1991), the court found that verbal and written consent to search a home was rendered involuntary after the police, who had been invited into the home, conducted a non-consensual, room-to-room search of the home. The Gonzalez court noted:
At the outset, we entertain serious doubt as to whether Mrs. Gonzalez voluntarily allowed the police to enter her house. She was confronted at 9 o'clock at night with five police officers clad in police raid jackets, three of whom were on her front doorstep and two who were trespassing on both sides of her house in the yard for supposed security purposes  a truly frightening display of authority. One of the officers identified himself, said the police were conducting a narcotics investigation, and indicated he "would like to speak with her." Under these circumstances, we think a reasonable person might well have interpreted this statement as an order, not a request, to let the police enter her house so they could speak to her; if this be the case, her subsequent "invitation" to enter the house was an acquiescence to authority, not a voluntary consent.
Id. at 733.
Here, the totality of the circumstances indicate that Christopher's consent to search his residence was involuntary. At the outset, we note the encounter took place at appellants' residence, which is entitled to the highest degree of protection. See Kutzorik, 891 So.2d at 648; Gonzalez v. State, 578 So.2d at 734 ("A private home . . . is an area where a person enjoys the highest reasonable expectation of privacy under the Fourth Amendment . . . and . . . accordingly, the factors bearing on the voluntariness of a consent to search a home must be scrutinized with special care."). Further, the time of the encounter is an important consideration when considering whether consent was voluntary, or the product of a show of authority. See Kutzorik, 891 So.2d at 648. Here, the encounter took place at the appellants' residence at 4:00 in the morning and lasted between one and a half to two hours. Moreover, it appears that in this case there were at least four police officers who showed up at the appellants' residence at the late hour of the night. This show of force tends to indicate that consent was involuntary. In Miller v. State, 865 So.2d 584, 588 (Fla. 5th DCA 2004), the court considered three officers to be a "considerable show of authority" to "create the perception that a major criminal investigation was underway." See also 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(b) (4th ed. 2004) ("The presence of a number of policemen is likely to suggest that the police are contemplating an undertaking which does not depend upon the cooperation of the individual from whom permission to search is being sought."). Under those circumstances, the court found that a reasonable person would feel less inclined to rebuff an officer's request. While a strong police presence alone does not render the consent invalid, the number of officers present is clearly a factor to be taken into consideration. See Kutzorik, 891 So.2d at 648; see also 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(b) (4th ed. 2004) ("although it *591 is true that `the presence of a large number of officers does not present a situation which is per se coercive,' that fact in tandem with others may well result in a finding that the consent was not voluntary") (citation omitted).
Additionally, cases have held that repeated requests for consent to search can render such consent involuntary. See, e.g., Seuss v. State, 370 So.2d 1203 (Fla. 1st DCA 1979); Gonterman v. State, 358 So.2d 595 (Fla. 1st DCA 1978). In the instant case, Christopher was asked two times, over the span of one and a half to two hours, if he would consent to a search of the home. Although this may not constitute "repeated requests," combined with the other circumstances in this case, it lends support to a conclusion that consent was involuntary. Finally, the police officers indicated to Christopher that they believed he was involved in certain thefts and that they thought they would find evidence of the crimes within the home. When the police make it clear to a citizen that he or she is the suspect in a criminal investigation, any coercive effect of the police presence on appellants' property is further exacerbated. See Miller, 865 So.2d at 588.
For the foregoing reasons, we find that the totality of the circumstances demonstrate that Christopher's consent to search his home was not voluntary. See Kutzorik, 891 So.2d at 647-49; Gonzalez, 578 So.2d at 733-34. However, for the reasons stated below, the motions to suppress were properly denied.

III. INEVITABLE DISCOVERY
In Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Supreme Court adopted the inevitable discovery rule, which allows evidence obtained as the result of unconstitutional police procedure to be admitted if the evidence would ultimately have been discovered by legal means. For the inevitable discovery doctrine to apply, the state must establish by a preponderance of the evidence that the police ultimately would have discovered the evidence independently of the improper police conduct by "means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure." See Hatcher v. State, 834 So.2d 314, 317-18 (Fla. 5th DCA 2003) (citing Craig v. State, 510 So.2d 857, 863 (Fla.1987)).
As noted, in essence the trial court denied the motion based on grounds of inevitable discovery. Although the trial court never mentioned the doctrine explicitly, the trial court found that, but for Christopher's consent, the police would have obtained a search warrant because sufficient probable cause existed to support the issuance of a warrant. We agree with the trial court and find that the police had probable cause to obtain a search warrant,[3] and thus, would have "inevitably discovered" the evidence seized from the residence.[4]
In Conner v. State, 701 So.2d 441 (Fla. 4th DCA 1997), the court affirmed the judgment and conviction of a defendant who, like the appellants in the instant case, pled no contest, but appealed the trial *592 court's denial of a dispositive motion to suppress. The court found that consent to a warrantless search was invalid, but held that the contraband found during the search was admissible because sufficient probable cause for a search warrant existed, leading to the inevitable discovery of the contraband. Id. at 443.
In similar situations, federal courts stress whether the police began the process of obtaining a warrant and whether probable cause to secure that warrant existed. In United States v. Virden, 488 F.3d 1317 (11th Cir.2007), the Eleventh Circuit discussed the inevitable discovery rule as it applies to the failure to get a warrant. That Court stated:
Under the inevitable discovery exception, if the prosecution can establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means, the evidence will be admissible. . . . This circuit also requires the prosecution to show that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." This second requirement is especially important. Any other rule would effectively eviscerate the exclusionary rule, because in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action.
Id. at 1322-23 (citations omitted).
Likewise, the Second and Tenth Circuits require the police to have taken steps to procure a warrant for the inevitable discovery doctrine to apply to warrantless searches. Those circuits adopted four factors to assess warrantless search situations: (1) the extent to which the warrant process has been completed; (2) the strength of the showing of probable cause at the time the search occurred; (3) whether a warrant ultimately was obtained, albeit after the illegal entry; and (4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli. See United States v. Cunningham, 413 F.3d 1199, 1203-04 (10th Cir.2005); United States v. Cabassa, 62 F.3d 470 (2d Cir.1995). The tenth circuit has stated that the court should apply the inevitable discovery rule "when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." Cunningham, 413 F.3d at 1203 (citing United States v. Souza, 223 F.3d 1197, 1205 (10th Cir.2000)). Contra U.S. v. Reilly, 224 F.3d 986, 995 (9th Cir.2000) (holding that the inevitable discovery doctrine does not apply just because the police could have obtained a warrant; "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment").
As a final example, the Fourth Circuit has stated:
The [inevitable discovery] doctrine may even apply where the subsequent search that inevitably would have uncovered the disputed evidence required a warrant and the police had probable cause to obtain this warrant prior to the unlawful search but failed to do so, if the government produces evidence that the police would have obtained the necessary warrant absent the illegal search. Such evidence might include proof that, based on independent evidence available at the time of the illegal search, the police obtained and executed a valid warrant subsequent to that unlawful *593 search, or took steps to obtain a warrant prior to the unlawful search.
U.S. v. Allen, 159 F.3d 832, 841 (4th Cir. 1998) (citations omitted).
Thus, federal law suggests that the inevitable discovery doctrine will not be applied in every case where the police had probable cause for a search warrant, but failed to get one. The cases focus on whether the police made an effort to get a warrant prior to the illegal search and whether strong probable cause existed for the search warrant.
The trial court specifically found, based on competent, substantial evidence in the record, that Investigator Mathis was in the process of obtaining a warrant when Christopher consented to the search. See Cuervo v. State, 967 So.2d 155, 159 (Fla. 2007) ("An appellate court reviewing a ruling on a motion to suppress presumes the trial court's findings of fact are correct and reverses those findings only if they are not supported by competent, substantial evidence."). The record also demonstrates that probable cause existed upon which a warrant could have been obtained. In Pagan v. State, 830 So.2d 792, 806 (Fla.2002), the Court stated:
In determining whether probable cause exists to justify a search, the trial court must make a judgment, based on the totality of the circumstances, as to whether from the information contained in the warrant there is a reasonable probability that contraband will be found at a particular place and time.
In making a determination regarding probable cause, the trial court must stick to the four corners of the affidavit. Id. Here, the record does not contain the probable cause affidavit as it was either lost or destroyed. However, Investigator Mathis testified that on August 12, 2005, he was investigating the theft of an ATM from the Bay Point Marriott.[5] A loss prevention officer at the Marriott had obtained the "tag number" of the truck used during the theft of the ATM, and records indicated that the truck belonged to appellants' father. The appellants' father stated that his son (Eric) had the truck and had taken it to appellants' residence to take some debris to the Marriott to be thrown away. Finally, an employee of the Marriott had identified Christopher McDonnell as the perpetrator of an earlier crime at the Marriott. We find that the totality of the evidence indicates that probable cause existed for a warrant.
Because the state has shown by a preponderance of the evidence that the search warrant would have been issued based on probable cause, the application of the inevitable discovery doctrine in this case is appropriate. See Conner v. State, 701 So.2d 441, 443 (Fla. 4th DCA 1997).
AFFIRMED.
POLSTON and THOMAS, JJ., concur; HAWKES, J., dissents with opinion.
HAWKES, J., Dissenting.
I agree with the majority's conclusion that entry by law enforcement into the defendants' home was not based on valid consent. This conclusion is premised on the fact that one of the defendants was illegally detained[6] on his front porch for over two hours dressed only in a bath towel before acquiescing to law enforcement's request to enter his home. Since no warrant was obtained, the evidence seized *594 from the home must be suppressed unless some valid exception to the warrant requirement exists. The majority accepts the State's argument that the inevitable discovery doctrine provides such an exception. Because I disagree with the majority's analysis and application of the inevitable discovery doctrine, I dissent.
The "core rationale" of the exclusionary rule is to deter police misconduct by ensuring the prosecution is not placed in a better position than it would have been in had no illegality occurred. See Nix v. Williams, 467 U.S. 431, 442-443, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); Jefferson v. Fountain, 382 F.3d 1286, 1295 (11th Cir.2004). However, "the high social cost of allowing obviously guilty persons to go unpunished counsels against" placing the prosecution in a worse position than it would have if the constitutional violation not occurred. Jefferson, 382 F.3d at 1295 (citing Nix, 467 U.S. at 443, 104 S.Ct. 2501).
Synthesizing these interests, the inevitable discovery doctrine allows evidence obtained as the result of unconstitutional police procedure to be admitted only where the prosecution can prove compliance with two requirements. See U.S. v. Virden, 488 F.3d 1317, 1322-1323 (11th Cir.2007); Moody v. State, 842 So.2d 754, 759 (Fla. 2003) (quoting Nix, 467 U.S. at 457, 104 S.Ct. 2501) (Stevens, J., concurring); Jeffries v. State, 797 So.2d 573, 578 (Fla.2001).
First, the State must show the evidence would ultimately have been discovered by legal means, independent of the improper police conduct through "normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure." Craig v. State, 510 So.2d 857, 863 (Fla.1987) (citing United States v. Satterfield, 743 F.2d 827 (11th Cir.1984)). In other words, the case must be in such a posture that facts already in police possession would have led to the evidence notwithstanding the police misconduct. See Moody, 842 So.2d at 759; Fitzpatrick v. State, 900 So.2d 495, 514 (Fla.2005).
Second, the State must show the lawful means which made discovery inevitable were being "actively pursued prior to the occurrence" of any illegal conduct. Satterfield, 743 F.2d at 846; see also United States v. Terzado-Madruga, 897 F.2d 1099, 1114-1115 (11th Cir.1990); Jefferson, 382 F.3d at 1296; Virden, 488 F.3d at 1322-1323. "The Government cannot later initiate a lawful avenue of obtaining the evidence and then claim it should be admitted because its discovery was inevitable." Satterfield, 743 F.2d at 846.
These two requirements are necessary to preserve the core rationale of the exclusionary rule: that the State not benefit from illegal activity, and is therefore deterred from illegal activity. Compliance with these requirements dictate that only the knowledge law enforcement possessed (the first requirement) and only the actions law enforcement took prior to any illegal conduct (the second requirement) can be considered by the trial court when determining the applicability of the inevitable discovery doctrine. Although I am not convinced the "inevitable search warrant" the majority espouses here is independent of any improper conduct as mandated by the first requirement, it is the second requirement that creates the greatest hurdle for the State.
As the Eleventh Circuit observed, the "second requirement is especially important" because "[a]ny other rule would effectively eviscerate the exclusionary rule." Virden, 488 F.3d at 1322 (citations omitted). This is true because "in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence *595 through some lawful means had they taken another course of action." Id. at 1322-1323. "Because a valid search warrant nearly always can be obtained after the search has occurred, a contrary ruling would practically destroy the requirements that a warrant for the search of a home be obtained before the search takes place." Satterfield, 743 F.2d at 846 (emphasis in original).
Case law provides examples of what is necessary for the State to establish compliance with the second requirement, which mandates the lawful means which makes discovery inevitable were being "actively pursued prior" to any illegal police conduct.
In Nix, the case in which the United States Supreme Court adopted the inevitable discovery rule, evidence of the location and condition of a murder victim's body was first learned through an illegal interrogation of the defendant. However, before the defendant's coerced and incriminating disclosures, the police had organized and directed approximately 200 volunteers who were searching for the body. The searchers were instructed to "check all the roads, the ditches, any culverts . . . If they came upon any abandoned farm buildings, they were instructed to go onto the property and search those abandoned farm buildings or any other places where a small child could be secreted." See 467 U.S. at 448-449, 104 S.Ct. 2501.
The search area was marked off in grids, and the volunteers were divided into teams of four to six people. Each team was assigned to search a specific grid. See id. The search commenced at approximately 10:00 a.m., and had moved through two counties. At approximately 3:00 p.m., the search was halted because the defendant disclosed the location of the body. The body was found two and one-half miles from where the search stopped. The body was located in a grid that would have been searched within three to five hours had the search continued.
Under these circumstances, the Supreme Court held evidence of the body and its location was admissible as it would have been inevitably discovered absent the defendant's illegal interrogation. See id. at 450, 104 S.Ct. 2501. In other words, the prosecution did not obtain any benefit from law enforcement's illegal interrogation of the defendant.
In Terzado-Madruga, police obtained the identity of a witness by illegally taping a phone conversation between the defendant and another person. The court held the witness's identity was admissible, because even though it was unknown to police officers conducting the illegal taping, another conspiracy member capable of identifying the witness had already voluntarily agreed to cooperate with police. See 897 F.2d at 1114-1115. The same information would have been provided by this coconspirator. Again, the prosecution was not placed in a better position as a result of law enforcement's illegal wire taping.
In U.S. v. Brookins, the police obtained the identity of a key prosecution witness through the illegal interrogation of the defendant. The court held the witness's testimony was admissible because lawful police inquiries already "set in motion" would have disclosed the witness's identity. See 614 F.2d 1037, 1048 (5th Cir.1980). Consequently, the prosecution was not advantaged as a result of the illegal wire taping.
Conversely, in Satterfield, the Eleventh Circuit found it was error to admit evidence where police conducted an illegal search of a defendant's home prior to obtaining a search or arrest warrant. See 743 F.2d at 846. Although the police had sufficient probable cause to obtain a search *596 warrant at the time of the search, and later obtained a search warrant for the property, the court held inevitable discovery did not apply because the police did not take any steps to procure the warrant prior to conducting the illegal search. See id.
Here, the trial court found the officers had probable cause to search the defendants' residence. Instead of pursuing the option of obtaining a search warrant, officers instead chose to go to the defendants' home. The 4:00 a.m. visit, although not granting police the hoped for entry into the home, did place one of the defendants on notice that he was a suspect.
Once he became aware that he was a suspect, he could not be allowed to return into the house without placing potential evidence at risk. Now a permissible citizen encounter had to evolve into something else. Confronted with the Hobson's choice they created, police could either illegally detain the defendant, or leave and allow him to return inside his home, where he could possibly tamper with evidence. They chose detention.
It is only the knowledge police had prior to the detention, and the actions police had taken prior to the detention, that are constitutionally relevant to an inevitable discovery analysis. Here, the pursuit of the more burdensome, but constitutional, process of obtaining a search warrant only began after the illegal detention. Therefore, the State cannot establish compliance with the second requirement. Accordingly, the inevitable discovery rule is not applicable.
This leads back to the core rationale of the exclusionary rule. Because the State had to utilize an illegal detention to preserve the viability of the warrant option, they benefitted from illegal activity. When the prosecution benefits, illegal activity is not deterred.
I am concerned that the majority changes the State's burden from proving law enforcement would have inevitably discovered the evidence through lawful means actively underway, to a burden that the State show that they could have obtained the evidence through lawful means subsequently undertaken. Such a change is significant and not one the Constitution permits. I would reverse the trial court's denial of the motion to suppress and remand for a new trial.
NOTES
[1] Police were also in possession of a video of an earlier crime committed at the Marriott. An employee of the Marriott had identified appellants as the men in that video.
[2] Investigator Mathis testified that he was accompanied by at least three other officers, although there could have been more.
[3] The trial court specifically found that probable cause existed for the search warrant based on the identification of the truck used in one of the crimes and the identification of the appellants on a video of a previous crime at the Marriott.
[4] "In reviewing the denial of a motion to suppress, we view the evidence and its reasonable inferences in the light most favorable to affirming the trial court's ruling." Ingram v. State, 928 So.2d 423, 428 (Fla. 1st DCA 2006).
[5] At the time of the theft, Christopher McDonnell was an employee of the Marriott.
[6] One officer testified the defendant was not free to leave. No argument was made that police had probable cause to justify the two hour detention on the porch.