852 So.2d 954 (2003)
Lyndon James HICKS, Appellant,
v.
STATE of Florida, Appellee.
No. 5D02-1640.
District Court of Appeal of Florida, Fifth District.
August 29, 2003.
*956 James B. Gibson, Public Defender, and A.S. Rogers, Assistant Public Defender, Daytona Beach, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and, Bonnie Jean Parrish, Assistant Attorney General, Daytona Beach, for Appellee.
*957 MONACO, J.
We are asked to determine in this appeal whether the trial judge erred in denying a motion to suppress certain evidence. Specifically, the defendant argues that the police unlawfully searched his backpack, and seized items in and on top of it.
A vehicle owner filed a police report indicating that someone had broken into her automobile and removed her purse and a spare set of keys. Later, the police received a report that the vehicle associated with the keys had been stolen. Fortunately, the vehicle was equipped with an "Onstar" satellite tracking system, which enabled the police to locate it at a house in Apopka. The vehicle was backed into the front yard and partially hidden from view.
Four police officers went to the front door of the house, and spoke to Elizabeth Setaram (a co-defendant), who answered the door. She initially claimed that she was alone and had no knowledge of the stolen vehicle in the front yard. When asked if she would unlock the front security door, Ms. Setaram responded that she did not have the door key. Apparently, Ms. Setaram then telephoned the homeowner, who eventually returned to the house and gave his permission for the officers to enter and search the entire residence.
One of the law enforcement officers involved in the search testified that while they were at the front door waiting for the homeowner to arrive, Ms. Setaram kept walking back and forth away from the door and was whispering. Eventually she admitted that someone else was in the house. Ms. Setaram called the person "Tip Mathews," and told the officers that he didn't want the officers to know that he was inside the house.
Once inside, the officers made contact with the defendant, Hicks. According to the homeowner, Ms. Setaram had only been at the house for two days. The homeowner related that Ms. Setaram was a friend, and he was allowing her to sleep in the front bedroom. After Ms. Setaram gave permission to the law enforcement officers to search the bedroom, the officers conducting the search observed drug paraphernalia and a substance that turned out to be cocaine.
In addition, while conducting the search of the bedroom, an officer observed a CD case containing nine games resting on top of a backpack that Hicks identified as his. According to the officer, Hicks gave his permission to search the backpack, from which the officer recovered a key ring and keys that had been taken from the stolen vehicle. The victim shortly thereafter was called to the premises and positively identified the CD case and games as having been in the stolen vehicle. The police also recovered from the backpack various screwdrivers, flashlights, rubber gloves, pliers and wire cutters.
In due course Hicks filed a motion to suppress, arguing that the evidence on and in the backpack was illegally seized without a warrant. According to Hicks, once the officers were inside the residence, they handcuffed him and made him sit in the living room. Hicks told the officers that because he was "handcuffed and surrounded by other officers" he "guessed he didn't have any choice," when asked if he would give his permission to search the backpack.
The following was offered by the officer as an explanation for handcuffing the defendant:
Q. Based on the behavior she was exhibiting, in your training and experience, what did that lead you to believe or what did you think might be going on?
A. That she was hiding something and so when we entered the house, we made *958 sure that we secured her. Once we entered the house, we noticed a black male standing in what I believe is a living room area off to the kitchen which is an area she kept walking to and then coming back from. So at that time we secured the black male also just for our safety.
* * *
Q. Okay. When you say secure, what exactly does that entail?
A. We secured him by keeping him in plain sight. We kept him in one room. We took the female into the kitchen area. We secured them by handcuffing them, that wayfor their safety and our safety, because we did not feel immediate need that they had any kind of weapons on them. We did a quick pat down, did not feel any kind of weapons, guns, or anything of that nature on them. So that way we can secure them that way.
Although he could not remember the defendant's exact words, the officer recalled that the defendant said with respect to the backpack, "[G]o ahead, search it."
Hicks argued that his consent to search was involuntary because he was handcuffed with an officer by his side at the time that he gave it, even though the authorities knew that he was not armed, having earlier patted him down. He points out that he was not a flight risk because there were four officers on the scene. The defense position was that the consent to search was involuntary and constituted only an acquiescence to unlawfully asserted police authority. After the trial court denied the defense motion to suppress without making factual findings, Hicks pled nolo contendere to burglary of a conveyance, and was sentenced to 13 months in state prison, reserving the right to appeal the denial of the motion to suppress. As part of the plea agreement the State filed a nolle prosequi to the charge of grand theft.
On appeal, Hicks contends that Ms. Setaram was released from her handcuffs once police conducted a pat down while he remained in handcuffs with an officer guarding him at all times. According to Hicks, the police demonstrated their authority and custodial control over him by choosing to restrain him after releasing the female, and, thus, any reasonable person would believe that they had no choice but to consent to a search of his property. Hicks concedes, however, that the police were justified in temporarily detaining him to investigate the reason why a stolen car was parked in front of a house where he was a guest.
The State counters that, assuming the police were justified in detaining the defendant to investigate the stolen car report, it also follows that Hicks had no expectation of privacy in the residence since he did not own or live in the house, and there was no evidence to suggest that he was an overnight guest.
We consider the validity of the search first with respect to the items found on top of the backpack, and then with respect to the items contained within the backpack.[1] The items on top of the backpack *959 were lawfully seized by the law enforcement authorities. The Fourth Amendment to the Constitution of the United States protects persons against unreasonable searches of "their persons, houses, papers and effects." It is, therefore, a personal right that must be invoked by the affected individual. Minnesota v. Carter, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Accordingly, suppression of the product of a search that violates the Fourth Amendment can be successfully urged only by those whose rights were violated by the search itself, and not by those who are "aggrieved solely by the introduction of damaging evidence." Jones v. State, 648 So.2d 669, 675 (Fla. 1994), cert. denied, 515 U.S. 1147, 115 S.Ct. 2588, 132 L.Ed.2d 836; March v. State, 725 So.2d 472 (Fla. 5th DCA 1999). Unfortunately for the defendant, he finds himself in the latter position with regard to the items on top of the backpack.
In order to invoke the Fourth Amendment to suppress a search the defendant must demonstrate that he or she had a subjective expectation of privacy in the location searched and that the expectation was reasonable or legitimate. Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); Katz, 389 U.S. at 361, 88 S.Ct. 507. The extent to which the Fourth Amendment offers protection may well depend on the status and location of the defendant at the time of the search. While there are occasions where an overnight guest might have a legitimate expectation of privacy in someone else's home [see Olson, 495 U.S. at 98-99, 110 S.Ct. 1684], one who is merely present with the consent of a homeowner generally may not claim that expectation. See Jones v. United States, 362 U.S. 257, 259, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).
In Carter, the United States Supreme Court held that persons present in the home of a casual acquaintance for a few hours for business purposes do not have a reasonable expectation of privacy. Temporary visitors or short-term invitees, such as the defendant in the present case, therefore, are generally unable to advance a position of privacy with success. Whether that expectation is legitimate must in the final analysis depend on the totality of the circumstances. See Tillman v. State, 807 So.2d 106, 109 (Fla. 5th DCA), rev. granted, 835 So.2d 271 (Fla.2002). Indeed, there are some contexts that can be envisioned in which a guest might meet the expectation of privacy test. See Davis v. State, 582 So.2d 61 (Fla. 1st DCA 1991).
The record, however, shows no more than that Hicks was a short-term invitee with no legitimate expectation of privacy with respect to the room where the backpack was located. Regardless of whether Hicks' consent to the search was voluntary, both the homeowner and the residentthose who might actually have had an expectation of privacygave permission to law enforcement to search.
Since the search of the bedroom was lawful, the items on top of the backpack were, as indicated previously, properly subject to seizure under the plain view doctrine. See Bolden v. State, 832 So.2d 153, 156 (Fla. 2d DCA 2002). The question of greater concern is whether the police lawfully searched the inside of the backpack. We conclude that the items *960 inside the backpack were unconstitutionally seized.
Although the defendant had no expectation of privacy with regard to the bedroom where the backpack was located, he did have an expectation of privacy regarding the contents of the closed backpack by virtue of the "suitcase" rule announced in Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).
The Sanders decision concerned a warrantless search of a closed but unlocked suitcase which contained a substantial quantity of marijuana. The suitcase was in the trunk of Mr. Sanders' automobile at the time both were lawfully and constitutionally seized by the police. The United States Supreme Court held that the warrantless search of the suitcase violated the Fourth Amendment, even though there was probable cause to search it.
The high court recognized that exigent circumstances might justify a warrantless search, but found none present. More specifically, since the police had the suitcase in hand, there was no danger that it would disappear. Under those circumstances, the Supreme Court held that "judicial approval" should have been obtained before opening the suitcase. See also, United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).
The United States Court of Appeals for the Tenth Circuit, following Sanders, applied the "suitcase" rule to backpacks. In United States v. Meier, 602 F.2d 253 (10th Cir.1979), the police conducted a warrantless search of a closed and unlocked backpack located within a vehicle owned by the defendant. Marijuana was found in the backpack. There were no exigent circumstances. The court found no significant difference between a suitcase and a backpack and quashed the search as violative of the Fourth Amendment. See also, Brown v. State, 789 So.2d 1021 (Fla. 2d DCA), rev. dismissed, 796 So.2d 537 (Fla.2001)(expectation of privacy existed in fanny pack left in car that was searched with consent). It is clear, accordingly, that Hicks had an expectation of privacy in the closed part of the backpack.
Finally, we now consider whether the defendant's consent to search the backpack was constitutionally voluntary.
To validate a search without a warrant, the state must demonstrate that the search falls within a constitutional exception, one of which is voluntary consent. See Smith v. State, 753 So.2d 713, 715 (Fla. 2d DCA 2000). When determining whether a consent to search was freely and voluntarily given a court must examine the totality of the circumstances at the time the consent was obtained. See United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); Reynolds v. State, 592 So.2d 1082, 1086 (Fla. 1992). If the search is not preceded by police misconduct, the state must prove that the consent was voluntarily given by a preponderance of the evidence. See Faulkner v. State, 834 So.2d 400 (Fla. 2d DCA 2003); State v. Collins, 661 So.2d 962, 965 (Fla. 5th DCA 1995). Where, however, there is an illegal detention or other illegal conduct on the part of law enforcement authorities, consent will be found to be voluntary only if there is clear and convincing evidence that the consent was not the product of that illegal police conduct. Reynolds.
In the present case Hicks was placed in handcuffs, patted down for weapons, and attended to by the police officers present. He remained handcuffed even though Ms. Setaram had been released when no weapons were found. His response to the request to search the backpack was equivocal at best. No effort was made to seek a warrant. The defense argues that under *961 these circumstances any consent given was involuntary, and that the search of the interior of the backpack should have been suppressed.
"[T]he police may properly handcuff a person whom they are temporarily detaining when circumstances reasonably justify the use of such restraint." Reynolds, 592 So.2d at 1085; Johnson v. State, 813 So.2d 1027 (Fla. 3d DCA 2002). Handcuffs may well be justified where it is reasonably necessary for the safety of the officers present, or to frustrate a suspect's attempt to flee. Reynolds.
Here, there may well have been justification for the use of handcuffs when Hicks was initially encountered. The continued use of handcuffs after the original pat-down search did not reveal any weapons. Thus, where there was no escape risk because of the presence of several police officers, a circumstance exists that weighs heavily on the voluntariness of Hick's consent to search the backpack.
Our supreme court has said:
[W]e are reluctant to hold that consent given while handcuffed can never be voluntary under any circumstances. There may be limited circumstances in which consent given while validly handcuffed during a temporary detainment may be found to be voluntary. [Citation omitted]. Because of the inherently coercive nature of handcuffing, the fact that one is under such restraint at the time consent is given will make the State's burden to show voluntariness particularly difficult. However, it is not the presence or absence of any one factor alone that determines the validity of consent. The question turns on the particular circumstances of each case.
Reynolds v. State, 592 So.2d at 1087; see also Butler v. State, 697 So.2d 907 (Fla. 2d DCA 1997).
No matter the burden of proof, the State did not demonstrate that the consent to search the closed backpack was voluntarily given. Accordingly, we must reverse the judgment and sentence, and remand this case to the trial court with instructions to grant the motion to suppress only with respect to the items recovered from the inside of the backpack, and to allow Hicks, if he chooses, to withdraw his plea and to proceed to trial on all charges, including the charge that the state dropped as part of the plea agreement.
REVERSED and REMANDED.
SAWAYA, C.J., concurs.
THOMPSON, J., concurring specially with opinion.
THOMPSON, J., concurring specially.
I concur with Judge Monaco's well-reasoned opinion as to the search of the room rented and occupied by Elizabeth Setaram. The record is clear that she freely spoke with police and, although initially handcuffed, was free of the handcuffs as she accompanied the police during their search of the house. She clearly stated that she rented the front bedroom and could therefore give permission to the police to search her bedroom and her personal property. Thus, any contraband found in the room could properly be introduced as evidence. I also agree that Hicks did not voluntarily consent to have his backpack searched. Review of the record shows that his permission, if given, was deliberately coerced. My reason for writing is to include additional facts to show how coercive the police conduct was.
After the police arrived and secured the perimeter of the house, the owner was called to open the locked security bars. The police entered and handcuffed Setaram and Hicks. Once the police determined that Setaram was not armed, she was released. On the other hand, the police did not remove Hicks's handcuffs although the police were satisfied that he *962 was not armed and presented no danger to them. Furthermore, Hicks was not particularly belligerent and did not make any threats. Hence, the continued detention was illegal. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Reynolds v. State, 592 So.2d 1082, 1084 (Fla. 1992).
Moreover, the police never read Hicks his Miranda[1] rights until he had been arrested and taken to jail, although they suspected him of grand theft and questioned him about the vehicle parked outside.[2] After Hicks said he was a visitor and professed his innocence of stealing the automobile, the police continued to question him for 15 minutes and subsequently brought out his backpack. When asked who owned the backpack, Hicks admitted it was his. The majority characterizes his response as equivocal because at the hearing on the motion to suppress, the officer testified he could not be sure whether Hicks said, "Go ahead" or "I guess I have no choice." The police also admitted they never explained to Hicks that he had a right to refuse to consent to the search of his backpack. The effect of Hicks's detention is demonstrated by his deteriorating demeanor. The officer testified that Hicks progressed from being nervous to being so agitated that he lost consciousness and had to be transported to the hospital. Finally, I note that of the seven people in the house, only Hicks was black. Considering all of these facts, there can be no doubt that his statement was the result of illegal police activity.
NOTES
[1] When considering an order on a motion to suppress, an appellate court should interpret the evidence and reasonable inferences and deductions drawn from that evidence in a light most favorable to sustaining the trial court's ruling. See Morris v. State, 749 So.2d 590, 592 (Fla. 5th DCA 2000); Thomas v. State, 644 So.2d 597, 598 (Fla. 5th DCA 1994). Upon review of such orders legal questions are considered de novo, while factual determinations are entitled to deference if supported by competent substantial evidence, provided, of course, that constitutionally mandated burdens of proof are met. See Williams v. State, 788 So.2d 334, 336 (Fla. 5th DCA 2001). It is not our function, therefore, to reweigh the evidence or to substitute our factual findings for that of the trial court. See State v. Smith, 632 So.2d 1086, 1088 (Fla. 5th DCA), cert. denied, 513 U.S. 914, 115 S.Ct. 290, 130 L.Ed.2d 205 (1994).
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Ramirez v. State, 739 So.2d 568, 573 (Fla. 1999) (holding that "[c]ustody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest").