BENTON, J.
James L. Thomas appeals convictions and sentences for sexual battery and petit theft, contending that evidence obtained in violation of the Fourth Amendment, and article I, section 12 of the Florida Constitution, was introduced against him at trial.[1] We reverse and remand for a new trial.
In the early morning hours of Saturday, September 13, 2008, a young woman reported that she had been raped and that her purse, containing a cellular telephone, had been stolen. Approximately 24 hours later, police were able to track her cell *660 phone[2] to the apartment Mr. Thomas shared with his girlfriend.[3] The investigators settled on a specific apartment “shortly after midnight” or “approximately 1:00 to 2:00 a.m.” on September 14, 2008. For the next few hours, six or seven police officers milled around outside the apartment, but made no effort to obtain a search warrant.
They did not want to obtain a search warrant because they did not want to reveal information about the technology they used to track the cell phone signal. “[T]he Tallahassee Police Department is not the owner of the equipment.” The prosecutor told the court that a law enforcement officer “would tell you that there is a nondisclosure agreement that they’ve agreed with the company.” An investigator with the technical operations unit of the Tallahassee Police Department testified: “[W]e prefer that alternate legal methods be used, so that we do not have to rely upon the equipment to establish probable cause, just for not wanting to reveal the nature and methods.” He also testified: “We have not obtained a search warrant [in any case], based solely on the equipment.”
The police eventually decided to knock on the door and ask for permission to enter,[4] and, at about five o’clock in the morning, three Tallahassee police officers knocked on the door of the apartment, and identified themselves as policemen. After about a minute, Mr. Thomas’s girlfriend, Ms. Simmons, answered the door in her night clothes. Learning they did not have a warrant, she told them to come back when they had one, and attempted to close *661 the door, but a police officer placed his foot inside the doorway to prevent her closing the door,[5],[6] removed her from the apartment, commanded anyone else inside the apartment to come outside, and entered the apartment with other officers.
Only after Mr. Thomas and the cell phone had been taken to the police station, Ms. Simmons testified, did she allow the police to search for and seize some of his other possessions.[7] But the trial court found that she had consented earlier — at a time when several officers remained inside the apartment and she was not permitted to reenter — to the search of the apartment and the seizure of its contents. The cell phone and a purse were seized, and Mr. Thomas was arrested and taken to jail. After further interrogation there, he was formally arrested on charges of kidnapping to facilitate a felony, sexual battery involving serious physical force, and robbery.
Trial counsel filed a motion to suppress all evidence obtained as a result of the warrantless search of the apartment, and as a result of interrogation at the apartment and at the police station. After an evidentiary hearing, the trial court orally denied the motion, determining the forcible entry and “protective sweep” were not illegal on grounds the police had a reasonable concern that other people were in the apartment who might have posed a threat to police officers’ safety, and that consent by Ms. Simmons could not have been tainted by an illegal entry because the entry was not illegal. Even if it were, the trial court said, there was a break in the chain of events leading to consent.
The cell phone, other physical evidence seized at the apartment, and statements Mr. Thomas made in the course of interrogations at the apartment and at the police *662 station all came in evidence against him at trial.[8] While acquitting him of the kidnapping charge, the jury found him guilty on the lesser-included offenses of sexual battery and theft, despite the victim’s inability to identify him as the perpetrator.
The trial court’s conclusion that the police entry into the apartment was lawful was error. Our “analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that ‘searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.’ Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).” Arizona v. Gant, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). The warrant requirement is among the “fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law.” Johnson v. United States, 333 U.S. 10, 17, 68 S.Ct. 367, 92 L.Ed. 436 (1948).
The home is at the “very core” of the interests the Fourth Amendment protects, and enjoys the maximum protection it provides. See Florida v. Jardines, — U.S. -, -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). While the home Mr. Thomas and Ms. Simmons shared might not fit some definitions of a traditional home, overnight houseguests have a legitimate expectation of privacy even in temporary quarters. See Minnesota v. Olson, 495 U.S. 91, 96-97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The Fourth Amendment[9] guarantees to the people “[t]he right ... to be secure in their ... houses ... against unreasonable searches and seizures.” Unwarranted “searches and seizures inside a home” require special scruti *663 ny. Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 68 L.Ed.2d 639 (1980). Government agents’ warrantless entry into a home is presumptively, constitutionally unreasonable.
The trial court ruled in the present case, however, that exigent circumstances excused the lack of a warrant: “I think they had a reasonable basis to be concerned about other people being in the apartment and doing the sweep was not illegal.” But there was absolutely no indication that any suspect would escape or that any evidence inside the apartment would be destroyed. Testimony that a cell phone could be flushed down the toilet does not meet the test. See Missouri v. McNeely, — U.S. -, -, 133 S.Ct. 1552, 1567, 185 L.Ed.2d 696 (2013) (rejecting argument “that the fact that alcohol is naturally metabolized by the human body creates an exigent circumstance in every [DWI] case” and requiring a warrant, absent proof of exigency). Nor was there any imminent risk of death or serious injury to any police officer that failing to get a search warrant ameliorated. See generally Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (defining exigent circumstances). “Accordingly, neither the officer protection nor the evidence preservation justification for the warrant exception applied.” Smallwood v. State, 113 So.3d 724, 735 (Fla.2013). Until the police knocked, Mr. Thomas and Ms. Simmons, in fact the apartment’s only two occupants, were apparently asleep.
For purposes of decision, we assume the police had probable cause to believe the missing cell phone was inside the apartment. But they needed a warrant, as well, absent any exception justifying their forced entry. See Coolidge v. New Hampshire, 403 U.S. 443, 449, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (requiring police to seek the authorization of a neutral magistrate before undertaking a search or seizure); Katz; 389 U.S. at 357, 88 S.Ct. 507.
Warrantless searches are disfavored and, with limited exceptions “per se unreasonable.” Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). See also Groh v. Ramirez, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). “[T]he police bear a heavy burden,” the cases teach, “when attempting to demonstrate an urgent need that might justify warrantless searches.” Welsh v. Wisconsin, 466 U.S. 740, 749-750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); Seibert v. State, 923 So.2d 460, 468 (Fla. 2006). Exceptions to the warrant requirement are “few in number and carefully delineated.” United States v. United States Dist. Court for Eastern Dist. of Mich., 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). See also Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). No exception applied here.
As more than one officer testified, Ms. Simmons did not consent to their entering the apartment. Plainly the decision to prevent her from closing the apartment door was the beginning of a warrantless search. The trial court did not find otherwise. This was no mere “knock and talk.” A
“knock and talk” is only justified as a consensual encounter during which officers are authorized to “approach a dwelling on a defined path, knock on the front door, briefly await an answer, and either engage in a consensual encounter with the resident or immediately depart.” Powell v. State, 120 So.3d 577 (Fla. 1st DCA 2013) (citing Nieminski v. State, 60 So.3d 521, 526 (Fla. 2d DCA 2011); Waldo v. State, 975 So.2d 542, 543 (Fla. 1st DCA 2008)). Given the consensual nature of the contact, of *664 course, a resident is supposed to have the option of refusing to open the door. Kentucky v. King, — U.S. -, -, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) (whether knock is by “police officer or a private citizen, the occupant has no obligation to open the door or to speak.”).
Calloway v. State, 118 So.3d 277, 279-80 (Fla. 5th DCA 2013). The trial court’s ruling “that the search was the result of a free and voluntary consent by Ms. Simmons” cannot be squared with basic, evi-dentiary, essentially undisputed, chronological facts. No evidence whatsoever supports any finding of consent before the police forced their way into the apartment.
In context, it is clear that the trial court ruled only that consent (albeit disputed[10] by Ms. Simmons) was given after police officers were already inside the apartment (and she had been ordered to remain outside in her night clothes). Where police obtain consent only after an illegal entry has taken place, the presumption arises that the ostensible consent was involuntary, and the prosecution has the burden of rebutting the presumption of involuntariness by clear and convincing proof. See Norman v. State, 379 So.2d 643, 647 (Fla.1980).
The voluntariness vel non of the defendant’s consent to search is to be determined from the totality of circumstances. But when consent is obtained after illegal police activity such as an illegal search or arrest, the unlawful police action presumptively taints and renders involuntary any consent to search. Bailey v. State [, 319 So.2d 22 (Fla. 1975) ]; Earman v. State, 265 So.2d 695 (Fla.1972); Taylor v. State [, 355 So.2d 180 (Fla. 3d DCA 1978) ]. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The consent will be held voluntary only if there is clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action. Bailey v. State, 319 So.2d at 28; Sheff v. State, 329 So.2d 270 (Fla.1976).
Id. at 646-47. We are aware of only one instance where a Florida court upheld a finding of a break in the chain of illegality, absent proof of specific knowledge of the right to refuse consent to search. See DuBoise v. State, 520 So.2d 260, 262-63 (Fla.1988) (holding break in the chain of illegality occurred despite lack of police advice that suspect could refuse consent because suspect repeatedly requested police to conduct a search). On the present record, there is no evidence that Ms. Simmons had any reason to believe that she had the right to refuse the officers, once they ignored her earlier effort to deny them entry into the apartment.
Even where a citizen does know of the right to refuse consent, and has reason to believe the right can actually be exercised, the presumption that consent is involuntary often carries the day. See, e.g., Reynolds v. State, 592 So.2d 1082, 1086 (Fla.1992) (ruling consent was invalid despite trial judge’s ruling otherwise based on express advisement that consent could be withheld). We have repeatedly ruled consent less than voluntary where it was obtained shortly after illegal police action occurred. See Davis v. State, 946 So.2d 575, 578 (Fla. 1st DCA 2006) (consent “occurred immediately after the claimed seizure”); Phuagnong v. State, 714 So.2d 527, 533 (Fla. 1st DCA 1998) (consent obtained *665 “only minutes later” than illegal search and arrest).[11]
In the present case, the trial court found that the police obtained consent after they detained Ms. Simmons and occupied the apartment. Illegal police activity was ongoing at the time, with police inside the apartment while Ms. Simmons was still being held outside the apartment. The state had the burden to prove that any *666 consent was independent of these circumstances. On this record, the state did not meet its burden to prove a clear break in the chain of illegality sufficient to overcome the presumption that any “consent” the trial court found Ms. Simmons gave before Mr. Thomas was taken to jail was not a voluntary act. The state proved no more than acquiescence to apparent authority, and “failed to meet its heavy burden of showing that petitioner’s consent to search was not fatally infected by the illegal intrusion.” Norman, 379 So.2d at 646.
In the present case, as in Reynolds, Norman, Calloway, Davis, Phuagnong, Turner v. State, 674 So.2d 896, 898 (Fla. 5th DCA 1996) and Cooper v. State, 654 So.2d 229, 231 (Fla. 1st DCA 1995), the state failed to overcome the presumption of involuntariness that arose from the unlawful search and seizure of the apartment. The trial court’s conclusion to the contrary was clearly erroneous.
Because police violated the Fourth Amendment and article I, section 12 of the Florida Constitution by entering the apartment without a warrant, and because neither subsequent consent nor the inevitable discovery doctrine[12] excuse the *667 constitutional violation in the present case, the trial court erred in failing to suppress the evidence obtained as a result of the violation.
Reversed and remanded.
RAY, J., concurs; MAKAR, J., dissents with opinion.

. Although he asserts other grounds for reversal, we consider only the failure to exclude evidence, physical and testimonial, obtained by or derived from the illegal entry into and search of the apartment and its contents.

. Mr. Thomas challenges as unlawful the deployment of the technology that allowed the cell phone to be tracked. For purposes of decision, however, we assume the police acted lawfully up to the point that they forcibly entered the apartment. It is not clear that there was ever a ruling on the legality of the cell phone tracking methods used below.

. He spent "most nights” in the apartment. Only Ms. Simmons, the girlfriend, was on the lease.

. Plan B — in the event consent was denied— was, it soon became unmistakably clear, simply to storm the apartment. Officer Suleski testified:
Q Had you discussed the possibility of getting a search warrant?
A Yes.
Q And what was the nature of the discussion you had in that regard?
A And I can only speak from my half of my input — was we thought it was the best to go make contact at the door.
Q Which is ultimately what you all decided to do, right?
A That’s correct.
Q And as I understood your testimony on direct examination, if you did not gain entry to the apartment at that point in time, you did intend to secure for the purpose of later obtaining a search warrant. Is that correct?
A Yeah. Yeah, immediately after.
Q Well, you intended to secure the apartment?
A Yeah. And immediately after we would seek a search warrant.
Q That's what — right, we would agree. Now when we talk about securing the apartment that means entering and conducting the protective sweep that you talked about. Right?
A Correct.
From this testimony, it is clear that the police had determined, prior to knocking on the door, that regardless of whether they obtained consent to search, they were going to enter the apartment and “secure it,” although they had no evidence that anyone in the apartment was armed, posed a specific danger to police safety, was destroying evidence, would later destroy evidence, or was attempting to escape. The trial court gave no indication it credited Officer Suleski’s earlier testimony that
Q Okay. What had already been discussed regarding a search warrant?
A Well, before we even — back before we even made contact at the door that was the plan. The plan was that if we did not get consent or something we would seek a search warrant.

. Officer Suleski testified, as follows:
I think we specifically asked her that we were looking — we asked her if someone placed something inside of her apartment.
THE COURT: I didn't quite understand. What?
THE WITNESS: We asked her if someone placed something inside her apartment, a cellular phone and then if we can come inside her apartment and look. She said— she asked if I had a search warrant. I said no, but I can go get one. And then she says well, you can come back, some detective can come back and get one.
She began to slam the door, at which point I placed my foot inside the door preventing her from slamming the door.

. Investigator Wester testified on re-direct examination, as follows:
Q Okay. And had you not been able to— had Investigator Suleski not put his foot in the door and the door would have closed, would you have any — would law enforcement have had any way of insuring that the cellphone wasn’t destroyed, damaged, flushed down the toilet, anything of that nature?
A No, ma’am, there would have been no way.

.Ms. Simmons testified on direct examination:
They said they could go get a warrant. But this is after they had already obtained what they needed because I had asked about it and we sat there for hours and we waited — waited for them, I guess for the judge to get up get up or whatever, to issue the warrant.
Then she testified on cross examination:
A I never gave anybody consent to go inside. I gave them consent to search when they were asking me the different things that they were still looking for. They said there was a camera that was missing. I told them they could look for it. He asked what he had [] on; I showed them the clothes. I told them they could take it. That’s the type of consent that I was giving.
[[Image here]]
A That was after they had already taken James down to the station.
[[Image here]]
[[Image here]]
*662 A No.

. The exclusionary rule applies to statements and other evidence derived from illegal searches and seizures. See generally Dunaway v. New York, 442 U.S. 200, 218, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (requiring exclusion of the "fruit of the poisonous tree”); Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); United States v. Flores-Sandoval, 422 F.3d 711, 714 (8th Cir.2005) ("evidence 'obtained by exploitation of [an unlawful detention] instead of by means sufficiently distinguishable to be purged of the primary taint' " must be excluded (quoting United States v. Guevara-Martinez, 262 F.3d 751, 755 (8th Cir.2001))).

. The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause....” Amend. IV, U.S. Const. Similarly, the Florida Constitution provides
[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause .... This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.
Art. I, § 12, Fla. Const. The latter half of section 12, the Conformity Clause, requires that this Court construe article I, section 12 the same way that the United States Supreme Court construes the Fourth Amendment, despite the difference in language between the two provisions. See State v. Hume, 512 So.2d 185, 187 (Fla. 1987).

. The trial court found that Ms. Simmons consented while Mr. Thomas was still on the scene. She testified she gave no consent of any kind until several hours later, after he had been taken away. See ante, note 7.

. As the Supreme Court explained, judicial review in search and seizure cases requires more than unquestioning acceptance of trial court determinations. See Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Once the " ‘historical facts are admitted or established, [and] the rule of law is undisputed, ... the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.’” Id. at 696-97, 116 S.Ct. 1657 (citation omitted). The Court has "never ... expressly deferred to the trial court’s determination” because a "policy of sweeping deference would permit ... 'the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause’ ” or consent and ”[s]uch varied results would be inconsistent with the idea of a unitary system of law” which, "if a matter-of-course, would be unacceptable.” Id. at 697, 116 S.Ct. 1657 (citation omitted). See also Connor v. State, 803 So.2d 598, 608 (Fla.2001) (holding appellate courts reviewing trial court rulings on motions to suppress "must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section[s] 9 [and 12] of the Florida Constitution").
Florida courts regularly reverse denials of motions to suppress in cases of illegal conduct on the part of law enforcement authorities, notwithstanding putative consent thereafter. See, e.g., Fernandez v. State, 63 So.3d 881, 884-85 (Fla. 3d DCA 2011) ("The defendant’s subsequent consent did not remedy the effect of the illegal entry. There was no break in the chain of events between the illegal entry and the procuring of the consent to the search.”); Navamuel v. State, 12 So.3d 1283, 1286 (Fla. 4th DCA 2009) ("The illegal pat down [in Navamuel's driveway] converted the consensual encounter into an unlawful stop. Because the state failed to show by clear and convincing evidence a break in the chain of events from the time the officers conducted the illegal stop and frisk and obtained appellant’s consent to search [his home], his consent is deemed involuntary.”); Hicks v. State, 852 So.2d 954, 960 (Fla. 5th DCA 2003) (holding that where "there is an illegal detention or other illegal conduct on the part of law enforcement authorities, consent will be found to be voluntary only if there is clear and convincing evidence that the consent was not the product of that illegal police conduct”); Butler v. State, 697 So.2d 907, 909 (Fla. 2d DCA 1997) (reversing denial of motion to suppress because when "seven police officers illegally entered Butler’s residence, handcuffed Butler and [another occupant], and told Butler that they would obtain a warrant to search his residence unless he consented to the search” without informing Butler he had a constitutional right to refuse the search, the "trial judge’s finding that Butler’s consent was freely and voluntarily given [wa]s clearly erroneous where the court did not find a ‘break in the chain of illegality’ sufficient to overcome the taint of the prior illegal police conduct” (citation omitted)). See also State v. Sakezeles, 778 So.2d 432, 435 (Fla. 3d DCA 2001) (affirming suppression of evidence when officers entered opened door of apartment, chased Sakezeles into the bathroom, pulled him into the living room and read him his rights because Sakezeles's subsequent "consent” to search of the apartment "amounted to nothing more than mere acquiescence to authority;” the consent of the owner of the apartment upon his return did not dissipate the taint because, "[g]iven the initial and continuing police illegality,” the apartment owner upon arriving home "was confronted with a fait accompli. The defendant signed his consent a half-hour before the co-resident got there. The search was already well underway. Just as you cannot un-ring a bell, you cannot un-search a home that has already been searched. There is insufficient evidence that [the owner’s] consent was anything but giving in to the inevitable.” (internal quotations omitted)).

. The state originally argued that the inevitable discovery doctrine precluded suppression of the evidence, but wisely abandoned this argument at oral argument. The inevitable discovery doctrine applies where police obtain evidence through unconstitutional means, but would ultimately have discovered the same evidence through proper procedures. See McDonnell v. State, 981 So.2d 585, 591 (Fla. 1st DCA 2008). The test is: (1) "whether strong probable cause existed for the search warrant” and (2) "whether the police made an effort to get a warrant prior to the illegal search." Id. at 593. Assuming without deciding, as we do, that probable cause existed, the second prong of the test was not met in the present case.
In McDonnell, we applied the inevitable discovery doctrine where evidence showed that, after the defendant initially denied consent to search, an officer left the scene to obtain a search warrant. Id. at 587. The defendant’s eventual consent to search — ■ deemed involuntary because it was given after the defendant had been held outside of his house in the wee hours of the morning for over two hours clad only in a bath towel — was given before the officer could return with the warrant, and the police conducted the search without the warrant. Id. We determined that the police were "in the process of obtaining a warrant” at the time consent was obtained, and that because probable cause existed, the warrant would have been issued. Id. at 593. The police were not "in the process of obtaining a warrant” when they entered the apartment Ms. Simmons and Mr. Thomas shared.
The Fourth District Court of Appeal refused to apply the inevitable discovery doctrine in Rowell v. State, 83 So.3d 990 (Fla. 4th DCA 2012). There, unlike in McDonnell, police had not yet left the scene to obtain a warrant at the time invalid consent was obtained. Concluding that no evidence showed a warrant was "being actively pursued prior to the occurrence of the illegal conduct,” the Fourth District determined the inevitable discovery doctrine did not apply. Id. at 995-96. Finally, in King v. State, 79 So.3d 236, 238 (Fla. 1st DCA 2012), we squarely held that the inevitable discovery doctrine did not apply where police "did not attempt to get a warrant.”
There is no evidence in the present case that police attempted to obtain a search warrant prior to entering the apartment illegally. The closest police came to taking affirmative steps to seek a warrant was that an officer "began taking notes as to the legal description for the apartment in anticipation of obtaining a search warrant.” Officers testified that they abandoned the idea of obtaining a search warrant before knocking on the apartment door. They testified they again decided to begin the process for obtaining a warrant after Ms. Simmons declined consent; but no action was taken until after officers had already entered and secured the apartment.
Tallahassee police had never sought a warrant in any case based on the cell phone tracking device used in the present case; and nothing in the record suggests that police officials ever considered seeking a warrant in this case based on this technology. It is impossible to conclude that officers were "in the process of obtaining a warrant,” i.e., actually attempting to get a warrant, as required by *667 our precedent, McDonnell, 981 So.2d at 593, and the inevitable discovery doctrine does not preclude operation of the exclusionary rule.